**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| CAESARS ENTERTAINMENT OPERATING COMPANY, INC., | Case No. 15-10047 (KG) |
| Alleged Debtor. | |
| _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ | |
| THE AD HOC COMMITTEE OF FIRST LIEN BANK LENDERS, | |
| Plaintiff, | Adversary No. _____ |
| v. | |
| CAESARS ENTERTAINMENT OPERATING COMPANY, INC. and CAESARS ENTERTAINMENT CORPORATION, | |
| Defendants. | |

## COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF

Plaintiff, by its undersigned attorneys, for its complaint alleges as follows:

## NATURE OF THE CASE

1.     This action is brought against debtor Caesars Entertainment Operating Company, Inc. ("CEOC" or the "Debtor") and its non-debtor parent, Caesars Entertainment Corporation ("CEC" and, with CEOC, "Defendants"), to enjoin and remedy their improper attempts to buy votes from First Lien Bank Lenders (defined below) in favor of a yet-to-be-filed plan of reorganization. The Defendants' purchase of such votes is being perpetrated through a pre-petition consent solicitation that was extended, post-petition, to January 26, 2015 (the "Improper Post-Petition Solicitation"),

which Plaintiff expects Defendants will extend yet again.

2.    Although the Debtor had already been placed into an involuntary chapter 11 proceeding in this Court on January 12, 2015, CEOC, together with 172 of its subsidiaries, voluntarily commenced chapter 11 proceedings in Illinois (the "Illinois Proceedings") in the United States Bankruptcy Court for the Northern District of Illinois (the "Illinois Bankruptcy Court") on January 15, 2015, thereby subjecting itself and its affiliates to obligations of a debtor-in-possession under the Bankruptcy Code. Notwithstanding CEOC's voluntary filing in Illinois, both the Debtor and CEC separately announced on Form 8-Ks filed with the Securities Exchange Commission (the "SEC") that they would continue their attempts to buy future plan votes from First Lien Bank Lenders by impermissibly extending the Improper Post-Petition Solicitation.

3.    The Improper Post-Petition Solicitation provides that in exchange for (a) the payment of a $150 million "consent fee", (b) the opportunity to purchase a *pro rata* share of $150 million of convertible notes to be issued by CEC and (c) receiving a portion of a cash sweep from the Debtor (collectively, the "Consent Payments"), consenting First Lien Bank Lenders must become party to a restructuring support agreement (the "RSA") with the Defendants, which, in turn, obligates such lender to (x) vote in favor of a yet-to-be-filed plan of reorganization implementing the Debtor's previously-announced REIT restructuring, (y) vote to amend and strip the current CEC guaranty of the First Lien Loans and (z) provide the Defendants, their sponsors and their respective directors and officers broad releases from any and all claims and causes of action, including with respect to CEOC's fraudulent transfers and its directors' breaches of fiduciary duty that have been detailed in myriad recent litigations.

4.      By pursuing the Improper Post-Petition Solicitation and extending the consent solicitation period beyond the petition date, Defendants are attempting to subvert the plan and disclosure statement process in violation of section 1125(b) of the Bankruptcy Code, resulting in direct and irreparable harm to Plaintiff and all other non-consenting First Lien Bank Lenders, as well as the chapter 11 estate generally.  Indeed, given the heavy media coverage this chapter 11 case and the Illinois Proceedings receive, Defendants knew or should have known that word of the solicitation extension would immediately be widely disseminated by the press.  Defendants, each represented by very sophisticated counsel, no doubt understand that soliciting plan votes absent a court-approved disclosure statement is contrary to law.

5.      Defendants' actions violate the bankruptcy laws and, by this Complaint, Plaintiff seeks declaratory and injunctive relief to immediately halt Defendants' unlawful behavior, especially given the high likelihood that Defendants will continue to extend the consent solicitation period.  Defendants' actions can and will continue to cause harm to Plaintiff's members, other non-consenting First Lien Bank Lenders and the Debtor's estate absent the injunctive relief requested by Plaintiff in this Complaint.  Absent such relief, Defendants could succeed in deceiving a majority of First Lien Bank Lenders into agreeing to the RSA absent adequate information required by a disclosure statement, thereby resulting in the stripping of the CEC guaranty of the First Lien Loans and releases of extremely valuable claims against Defendants and their directors and officers.

## JURISDICTION AND VENUE

6.      This court has jurisdiction over the subject matter of this claim by virtue of 28 U.S.C. § 1334.  This is a core proceeding as defined in 28 U.S.C. § 157.

7.      On January 12, 2015, certain creditors filed an involuntary chapter 11

petition against CEOC in this Court.  On January 15, 2015, CEOC and certain affiliates (the "Subsidiary Debtors") filed voluntary petitions for relief in the Illinois Bankruptcy Court under chapter 11 of the Bankruptcy Code.

8.      Venue is proper in this Court under 28 U.S.C. § 1409(a) because this adversary proceeding arises under title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code"), involves the Debtor's estate, and arises in and is related to Debtor's chapter 11 case, which is pending in this judicial district.  To the extent that this Court determines that venue of the bankruptcy cases is appropriate in the Illinois Bankruptcy Court, then Plaintiff respectfully requests that this adversary proceeding be transferred.

9.      The Debtor continues in possession of its properties and is operating and managing its business as a debtor-in-possession by virtue of the Illinois Proceedings pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  A motion for an examiner was filed in this Court by certain parties in interest that has yet to be set for a hearing.  A creditors' committee has not yet been appointed in this bankruptcy case, nor in the Illinois Proceedings.

## PARTIES

10.      Plaintiff Ad Hoc Committee of First Lien Bank Lenders is an ad hoc committee compromised of lenders ("First Lien Bank Lenders") under, and holders of loans ("First Lien Loans") issued pursuant to, the Debtor's Third Amended and Restated Credit Agreement, dated as of July 25, 2014 (as the same may be further amended, restated or supplemented from time to time, the "Credit Agreement").  In the aggregate, the funds or accounts managed or advised by the respective members of the Plaintiff Ad Hoc Committee of First Lien Bank Lenders hold more than a majority of the First Lien

Loans in an aggregate principal amount of approximately $2.9 billion.[1]

11.     Defendant CEOC is a Delaware corporation with a principal place of business in Las Vegas, Nevada.  CEOC is the Debtor in the involuntary chapter 11 case in this Court, and a Debtor in the voluntary chapter 11 cases pending in the Illinois Bankruptcy Court.

12.     Defendant CEC is a Delaware corporation that, through its subsidiaries, joint ventures and other arrangements, owns, operates and manages gambling casinos, hotels and entertainment properties in the United States and foreign countries.  CEC owns 89% of the equity of CEOC.  As a result, CEC and its Sponsors exercise complete domination and control over CEOC and its affairs.  CEC maintains its principal place of business at One Caesars Palace Drive, Las Vegas, Nevada.

## FACTUAL BACKGROUND

13.     In 2008, CEC (then operating as Harrah's Entertainment Inc.) was taken private in a $27 billion leveraged buyout by the Sponsors—one of the largest LBOs in United States history.  The deal was financed, in part, through the Credit Agreement that made CEC's principal operating company, the Debtor (then operating as Harrah's Operating Company, Inc.), the primary obligor on most of the debt used to fund the buyout.  Almost immediately, the financial crisis had a severe adverse impact on the Debtor's and the Subsidiary Debtors' businesses.

14.     Beginning in August 2014, the Defendants and certain of their directors and officers were sued in multiple actions for alleged fraudulent transfers, waste,

---

[1]     On January 23, 2015, counsel to Plaintiff filed a verified statement listing the membership of the Ad Hoc Committee of First Lien Bank Lenders and the aggregate holdings of the funds or accounts managed or advised by members of the Ad Hoc Committee of First Lien Bank Lenders with this Court pursuant to Rule 2019(a) of the Federal Rules of Bankruptcy Procedure.

mismanagement, breaches of fiduciary duties and other claims based upon the transactions described above.  These pending lawsuits, now stayed against the Debtor, include: (i) *UMB Bank v. Caesars Entertainment Corp. et al.*, Case No. 10393 (Court of Chancery for the State of Delaware); (ii) *Wilmington Savings Fund Society, FSB v. Caesars Entertainment Corp. et al.*, Case No. 10004-VCG (Court of Chancery for the State of Delaware); and (iii) *MeehanCombs Global Credit Opportunities Master Fund LP et al. v. Caesars Entertainment Corp. et al.*, Case No. 1:14-cv-07091 (S.D.N.Y.).

15.     As described in the above-referenced actions, beginning in 2008, and burdened with nearly $20 billion of the debt incurred in the LBO and subsequent transactions, and generating substantial operating losses, CEOC began transferring away billions of dollars' worth of its most valuable assets for little or no consideration, including (a) eight casino, hotel and entertainment properties on the Las Vegas Strip and elsewhere, as well as 50% of the management fees with respect to certain of these properties, (b) the Debtor's online gaming business, and (c) valuable intellectual property rights, including the Debtor's Total Rewards® customer loyalty program.  These transfers were not made to third-parties, but rather to CEC-affiliated non-Debtor entities that sit outside the Debtor's current credit structure.

16.     On October 16, 2014, certain members of the Plaintiff executed non-disclosure agreements ("NDAs") with the Debtor and commenced good faith negotiations regarding a comprehensive restructuring of its indebtedness.

17.     Negotiation among the parties eventually broke down, and on December 10, 2014, each of the NDAs expired pursuant to its terms.  Shortly thereafter, on December 11, 2014, the members of Plaintiff who had previously been party to the NDAs

disclosed all material nonpublic information regarding the Debtor in a press release (*available at*: http://www.prnewswire.com/news-releases/informal-committee-of-certain-first-lien-bank-lenders-of-caesars-entertainment-releases-information-about-restructuring-discussions-300008934.html).

18.     On January 12, 2015, a group of second lien noteholders including Appaloosa Investment Limited Partnership, OCM Opportunities Fund and Special Value Expansion Fund, filed an involuntary chapter 11 petition against the Debtor in this Court. The petitioners alleged, among other things, that the Debtor was insolvent and not paying its debts as they came due, principally as a result of the Debtor's failure to pay more than $225 million in interest owed to holders of the Debtor's $4.5 billion class of second-priority senior secured notes due 2018.  The petitioners also filed a motion requesting the appointment of an examiner to investigate and report on the series of prepetition insider transactions by which CEC systematically stripped the Debtor of billions of dollars of assets and cash in the fifteen months prior to bankruptcy.

19.     On January 12, 2015, both the Debtor and CEC announced in a press release and Form 8-K filings with the SEC that they were seeking consents (the "Initial Consent Solicitations") from First Lien Bank Lenders to sign the RSA that required them to cast votes as creditors of the Debtor in favor of a restructuring plan for the Debtor's outstanding obligations and liabilities,[2] to be entered into among the Debtor, CEC and any consenting First Lien Bank Lenders (each, a "Consenting Lender").

20.     Also on January 12, 2015, the administrative agent under the Credit Agreement, at the request of the Debtor, posted to the "Intralinks" website ("Intralinks")

---

[2]         The RSA was filed with the SEC as an attachment to the Form 8-K filings.  Additionally, the RSA has the restructuring term sheet annexed to it, which is expressly made part of the RSA.

a memorandum prepared by the Debtor (the "Initial Intralinks Posting") requesting consents to the RSA and attaching for First Lien Bank Lenders to review, (i) a Restructuring Consent Term Sheet, (ii) a Restructuring Support and Forbearance Agreement, (iii) a Summary Term Sheet for Proposed Restructuring, (iv) a signature page to the Restructuring Agreement and (v) a $150 million Convertible Senior Notes— Summary of Principal Terms, including an election form for Consenting Lenders (collectively, the "Intralinks Documents").  First Lien Bank Lenders wishing to consent to the RSA and receive the Consent Payment were asked to execute a signature page and return it *to CEC's counsel* -- not the Debtor's counsel -- per the instructions contained in the Initial Intralinks Posting.  Likewise, any questions regarding the posting memorandum or the terms of the RSA were not to be directed to the advisors to the Debtor, but rather to the financial advisor and counsel *to CEC*.

21.     As further described in the 8-K filings, Consenting Lenders would receive (i)  their *pro rata* share of a $150 million consent fee from CEC, one-half of which would be paid within three business days after the 50% minimum consent threshold is met, and the remaining one-half would be paid on the effective date of a plan of reorganization, (ii) the opportunity to purchase their *pro rata* share of $150 million of certain convertible notes to be issued by CEC, and (iii)  a portion of the cash sweep to be shared with holders of the Debtor's first lien notes.

22.     In exchange for the Consent Payment, Consenting Lenders would be required to vote all of their First Lien Loans in favor of the Debtor's future plan of reorganization (implementing the terms of the restructuring set forth in the RSA and on the restructuring term sheet annexed to the RSA), and the Debtor, its estate and all of the

Debtor's creditors "shall be deemed to have released CEC . . . and [its] respective direct and indirect sponsors, shareholders, affiliates, officers, directors, employees, managers, attorneys, professionals, advisors and representatives . . . from any and all claims, obligations, suits, judgments, damages, rights, causes of action and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, at law, in equity or otherwise, relating to or based upon any act or omission relating to the [Debtor] which occurred prior to the effectiveness of the [restructuring transaction]." The consent period was scheduled to end at 9:00 p.m., New York City time, on January 14, 2015 (the "Initial Consent Deadline").

23.    In direct response to the Initial Consent Solicitation, on January 12, 2015, members of the Plaintiff and certain other First Lien Bank Lenders (holding in excess of 50% of the aggregate principal amount of First Lien Loans), entered into a binding agreement (the "Lender Agreement") pursuant to which each agreed, with respect to the First Lien Loans that it owned or controlled, to not support the restructuring transaction contemplated by the RSA and restructuring term sheet unless the transaction was approved by the requisite supermajority threshold of First Lien Bank Lenders that were party to the agreement.  The Lender Agreement was subsequently amended on January 16, 2015, and now has been executed by First Lien Bank Lenders holding over 56% of all First Lien Loans.

24.    On January 14, 2015, the Debtor filed the *Objection of Caesars Entertainment Operating Company, Inc. to (1) Motion of Petitioning Creditors for an Order Staying Any Parallel Proceedings and (2) Emergency Motion to Shorten Notice and Scheduling an Expedited Hearing on Motion to Stay any Parallel Proceedings*

[Docket No. 29] in this chapter 11 case.  In the Objection, the Debtor stated that it was 24 hours away from commencing the Illinois Proceedings.

25.    At 1:37 a.m. ET on January 15, 2015 (the "Illinois Petition Date"), the Debtor, together with 172 of its subsidiaries voluntarily commenced the Illinois Proceedings in the Illinois Bankruptcy Court (Case No. 15-01145 (ABG)) by filing the petition for relief with respect to Southern Illinois Riverboat Casino Cruises Inc. (Case No. 15-01143).

26.    Also on the Illinois Petition Date and hours after the commencement of the Illinois Proceedings, the Debtor and CEC announced that the Debtor was extending the Initial Consent Date beyond the Illinois Petition Date.  The announcement of the Improper Post-Petition Solicitation was made through the filing of Form 8-Ks with the SEC, as well as through a subsequent memorandum prepared by the Debtor and posted to Intralinks (the "Post-Petition Intralinks Solicitation").  The Post-Petition Intralinks Solicitation referred First Lien Bank Lenders to the Initial Intralinks Posting and the Intralinks Documents, and notified them that the Debtor was extending the period during which it was seeking First Lien Bank Lender consents to the RSA "from 9:00 p.m. (New York City time) on January 14, 2015, to 5:00 p.m. (New York City time) on Monday, January 26, 2015 []."  Once again, First Lien Bank Lender questions were directed to the advisors *of CEC*, and not to the Debtor's advisors, and those who wished to consent were to return signature pages *to CEC's* counsel.

27.    News of the Improper Post-Petition Solicitation was picked up by various media outlets, including Yahoo! Finance (*available at*: http://biz.yahoo.com/e/150115/czr8-k.html).

**COUNT I**
**(AGAINST BOTH DEFENDANTS)**

**DECLARATORY JUDGMENT REGARDING IMPROPER**
**SOLICITATION PURSUANT TO 11 U.S.C. §1125(b)**

28.     Plaintiffs repeat the allegations contained in paragraphs 1 through 27 as if fully set forth herein.

29.     Section 1125(b) of the Bankruptcy Code provides that an acceptance or rejection of a plan of reorganization "may not be solicited after the commencement of the case under this title from a holder of a claim or interest with respect to such claim or interest, unless, at the time of or before such solicitation, there is transmitted to such holder the plan or a summary of the plan, and a written disclosure statement approved, after notice and a hearing, by the court as containing adequate information."  11 U.S.C. §1125(b).

30.     Defendants, through the Improper Post-Petition Solicitation, are making and will continue to make specific requests of First Lien Bank Lenders for an official vote on a plan of reorganization, although such a plan has yet to be filed.

31.     The Improper Post-Petition Solicitation has occurred and will continue to occur although no disclosure statement has been presented to the Court by the Debtor and, accordingly, the Court has not approved the terms of a disclosure statement as containing adequate information.

32.     The Improper Post-Petition Solicitation is a "solicitation" pursuant to section 1125(b) of the Bankruptcy Code because, *inter alia*, in order to receive the Consent Payment, First Lien Bank Lenders must become Consenting Lenders by signing up to the RSA, which, in turn, obligates each Consenting Lender to vote in favor of the Debtor's plan of reorganization, whenever that plan may be filed.

33.    There is an actual controversy between the parties regarding whether Defendants violated Section 1125(b) through their Improper Post-Petition Solicitation.

34.    Accordingly, Plaintiffs should be granted a declaratory judgment pursuant to 28 U.S.C. §2201 and Federal Rules of Bankruptcy Procedure 7001(9) that the Improper Post-Petition Solicitation violated and continues to violate Section 1125(b) of the Bankruptcy Code.

**COUNT II**
**(AGAINST BOTH DEFENDANTS)**

**INJUNCTIVE RELIEF**

35.    Plaintiffs repeat the allegations contained in paragraphs 1 through 36 as if fully set forth herein.

36.    Injunctive relief pursuant to Federal Rule of Bankruptcy Procedure 7065, Federal Rule of Civil Procedure 65 and 11 U.S.C. §105(a) is necessary and appropriate to enjoin Defendants from continuing the Improper Post-Petition Solicitation in violation of Section 1125(b) of the Bankruptcy Code.

37.    Upon information and belief, Defendants intend to extend the consent solicitation period of the Improper Post-Petition Solicitation when the current period expires on January 26, 2015.

38.    The Improper Post-Petition Solicitation violates Section 1125(b) of the Bankruptcy Code because such actions constitute solicitations made prior to the filing of a plan of reorganization and the approval by this Court of a disclosure statement.

39.    The allegations in this Complaint constitute meritorious grounds for injunctive relief to enjoin Defendants from continuing the Improper Post-Petition Solicitation.

40. Plaintiffs are reasonably likely to succeed on the merits of this action to enjoin the Improper Post-Petition Solicitation.

41. If the Improper Post-Petition Solicitation continues, then First Lien Bank Lenders, including members of Plaintiff Ad Hoc Committee of First Lien Bank Lenders, will continue to be solicited by Defendants to vote on a plan of reorganization without adequate information and, indeed, without a plan of reorganization having even been filed. Plaintiff and other non-consenting First Lien Bank Lenders will be harmed absent issuance of an injunction because Defendants, if successful in their scheme to buy votes without the disclosure required by Section 1125(b), will (i) be able to strip the CEC guaranty that currently exists as security for the First Lien Loans and (ii) obtain releases for themselves and their directors and officers of valuable pre-petition claims for, *inter alia*, fraudulent transfers and breaches of fiduciary duty. Accordingly, Defendants' actions in pursuing the Improper Post-Petition Solicitation can and will continue to cause Plaintiffs and other First Lien Bank Lenders irreparable harm.

42. The harm to Plaintiffs and other First Lien Bank Lenders if the Improper Post-Petition Solicitation is not enjoined far outweighs the harm to the Defendants from such an injunction. The requested injunctive relief returns the parties to the *status quo* and ensures that any solicitation of votes on a plan of reorganization may only occur consistent with the requirements of the Bankruptcy Code.

43. The public has an interest in the successful reorganization of the Debtor's business. The requested injunctive relief will serve this public interest by ensuring that the Debtor and CEC proceed to confirm a plan of reorganization consistent with the requirements of the Bankruptcy Code.

44.     Plaintiffs have no adequate remedy at law.

**WHEREFORE**, Plaintiff respectfully requests that this Court enter judgment in their favor and against the Defendants, and:

A.     Declare that the Improper Post-Petition Solicitation is violative of Section 1125(b) of the Bankruptcy Code;

B.     Enter an order pursuant to Federal Rule of Bankruptcy Procedure 7065, Federal Rule of Civil Procedure 65 and 11 U.S.C. §105(a) enjoining Defendants, on a preliminary and permanent basis, from continuing the Improper Post-Petition Solicitation and from obtaining consents from any First Lien Bank Lender;

C.     Impose monetary and other sanctions upon Defendants as a result of their violation of Section 1125(b) of the Bankruptcy Code; and

D.     For such other and further relief as the Court deems just and proper.

Dated:    January 23, 2015            BAYARD, P.A.
          Wilmington, Delaware

                                      */s/ Justin R. Alberto*
                                      Neil B. Glassman (No. 2087)
                                      Justin R. Alberto (No. 5126)
                                      222 Delaware Avenue, Suite 900
                                      Wilmington, Delaware 19801
                                      Telephone: (302) 655-5000
                                      Facsimile: (302) 658-6395

                                      STROOCK & STROOCK & LAVAN LLP
                                      Kristopher M. Hansen
                                      Frank A. Merola
                                      Kenneth Pasquale
                                      Jonathan D. Canfield
                                      180 Maiden Lane
                                      New York, New York  10038
                                      Telephone: (212) 806-5400

                                      *Counsel to the Ad Hoc Committee of First Lien Bank Lenders*