# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| CAESARS ENTERTAINMENT OPERATING COMPANY, INC., | Case No. 15-10047 (KG) |
| Alleged Debtor. | |
| ------------------------------------------------------------- | |
| THE AD HOC COMMITTEE OF FIRST LIEN BANK LENDERS, | |
| Plaintiff, | Adv. Proc. No. 15-50090 (KG) |
| v. | |
| CAESARS ENTERTAINMENT OPERATING COMPANY, INC. and CAESARS ENTERTAINMENT CORPORATION, | **Re: Docket No.  2** |
| Defendants. | |

## BRIEF IN SUPPORT OF MOTION OF THE AD HOC COMMITTEE OF FIRST LIEN BANK LENDERS FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

Date:  January 23, 2015

BAYARD, P.A.
Neil B. Glassman (No. 2087)
Justin R. Alberto (No. 5126)
222 Delaware Avenue, Suite 900
Wilmington, Delaware 19801
Telephone: (302) 655-5000

STROOCK & STROOCK & LAVAN LLP
Kristopher M. Hansen
Frank A. Merola
Kenneth Pasquale
Jonathan D. Canfield
180 Maiden Lane
New York, New York  10038
Telephone: (212) 806-5400

*Counsel to the Ad Hoc Committee of
First Lien Bank Lenders*

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ...........................................

I.      INTRODUCTION ......................................................................................................1

II.     NATURE AND STAGE OF PROCEEDING .........................................................1

III.    SUMMARY OF ARGUMENT ...............................................................................2

IV.    FACTS ....................................................................................................................5

V.     ARGUMENT .........................................................................................................11

VI.    CONCLUSION......................................................................................................17

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*In re Am. Tissue, Inc.*,
No. 01-10370 KG, 2006 WL 3498065 (Bankr. D. Del. Dec. 4, 2006) ......................14

*In re Broadstripe, LLC*,
402 B.R. 646 (Bankr. D. Del. 2009) ..........................................................................13

*In re California Fid., Inc.*,
198 B.R. 567 (B.A.P. 9th Cir. 1996) ..........................................................................13

*In re CareMatrix Corp.*,
306 B.R. 478 (Bankr. D. Del. 2004) ..........................................................................14

*Century Glove, Inc. v. First Am. Bank of New York*,
860 F.2d 94 (3d Cir. 1988) ........................................................................................11

*In re Gilbert*,
104 B.R. 206 (Bankr. W.D. Mo. 1989) .......................................................................12

*In re Heritage Org.*,
376 B.R. 783 (Bankr. N.D. Tex. 2007) .......................................................................13

*In re Integrated Health Servs., Inc.*,
281 B.R. 231 (Bankr. D. Del. 2002) ..........................................................................16

*In re Lancelot Investors Fund, L.P.*,
No. 08-28225, 2011 WL 1465579 (Bankr. N.D. Ill. Apr. 15, 2011) ..........................14

*MeehanCombs Global Credit Opportunities Master Fund LP et al. v.
Caesars Entertainment Corp. et al.*,
Case No. 1:14-cv-07091 (S.D.N.Y.) ...........................................................................6

*In re Nautilus of New Mexico, Inc.*,
83 B.R. 784 (Bankr. D.N.M. 1988) ...........................................................................13

*In re Temple Ret. Cmty., Inc.*,
80 B.R. 367 (Bankr. W.D. Tex. 1987) ........................................................................13

*UMB Bank v. Caesars Entertainment Corp. et al.*,
Case No. 10393 .............................................................................................................6

*Wilmington Savings Fund Society, FSB v. Caesars Entertainment Corp. et al.*,
   Case No. 10004-VCG ................................................................................6

## CODES

11 U.S.C. § 105(a) .................................................................... *passim*

11 U.S.C. § 1121 ................................................................................11

11 U.S.C. § 1125(b) .................................................................. *passim*

11 U.S.C. § 1126(e) ...........................................................................5

Fed. Rules of Bankr. Proc. 7065 ...............................................1, 13

## I.    **INTRODUCTION**

The Ad Hoc Committee of First Lien Bank Lenders (the "Plaintiff" or the "Ad Hoc Committee"), as lenders ("First Lien Bank Lenders") under, and holders of loans ("First Lien Loans") issued pursuant to, the above-captioned Debtor's (the "Debtor") Third Amended and Restated Credit Agreement, dated as of July 25, 2014 (as the same may be further amended, restated or supplemented from time to time, the "Credit Agreement"), by and through its undersigned counsel, hereby submits this brief in support (the "Brief") of the *Motion of the Ad Hoc Committee of First Lien Bank Lenders for a Temporary Restraining Order and Preliminary Injunction* (the "Motion") pursuant to section 105(a) of chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") and Rule 7065 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), for a temporary restraining order ("TRO") and an preliminary injunction preventing the Debtor and its non-Debtor parent, Caesars Entertainment Company ("CEC"), from taking any actions with respect to their Improper Post-Petition Solicitation (defined below), which Motion is being filed concurrently herewith.

## II.    **NATURE AND STAGE OF PROCEEDING**

On January 12, 2015, a group of second lien noteholders including Appaloosa Investment Limited Partnership, OCM Opportunities Fund and Special Value Expansion Fund, filed an involuntary chapter 11 petition against the Debtor in this Court (the "Involuntary Chapter 11 Case").  The petitioners alleged, among other things, that the Debtor was insolvent and not paying its debts as they came due—principally as a result of the Debtor's failure to pay more than $225 million in interest owed to holders of the Debtor's $4.5 billion class of second-priority senior secured notes due 2018.  The petitioners also filed a motion requesting the appointment of an examiner to investigate

and report on a series of prepetition insider transactions by which CEC systematically stripped the Debtor of billions of dollars of assets and cash in the fifteen months prior to bankruptcy (the "Examiner Motion").

On January 23, 2015, the Plaintiff filed its Complaint commencing this Adversary Proceeding (the "Complaint"), along with the Motion and the *Declaration of Kenneth Pasquale in Support of Motion for Temporary Restraining Order and Preliminary Injunction*, dated January 23, 2015 (including all exhibits thereto, the "Pasquale Declaration"). The Complaint, the Motion and the Pasquale Declaration are each expressly incorporated herein by reference.

## III.   SUMMARY OF ARGUMENT

At this nascent stage of this Involuntary Chapter 11 Case, the Plaintiff finds itself needing to urgently seek this Court's intervention to protect the sanctity of the bankruptcy process and prevent the potential designation of votes cast by unsuspecting parties in response to the Debtor's and CEC's (collectively, the "Defendants") continued improper and self-serving activities that dominated every aspect of their pre-petition behavior. Accordingly, the Plaintiff commenced this action seeking a declaratory judgment and injunctive relief to protect its members' rights and the interests of the chapter 11 estate generally.

Hours after the Debtor, together with 172 of its subsidiaries, voluntarily commenced chapter 11 proceedings in the Illinois Bankruptcy Court (the "Illinois Proceedings")[1] thereby subjecting itself and its affiliates to obligations of a debtor-in-

---

[1]   The filing by the Debtor in the United States Bankruptcy Court for the Northern District of Illinois (the "Illinois Bankruptcy Court") instigated a dispute over the proper venue of the bankruptcy cases that will be determined by this Court in the near term, and the Illinois Proceedings are currently stayed. Although the Plaintiff believes that venue is proper here, in the event this Court ultimately determines

possession under the Bankruptcy Code, the Defendants separately on Form 8-Ks filed with the Securities Exchange Commission (the "SEC"), and the Debtor through a posting on Intralinks (defined below), announced that they would continue their attempts to buy plan votes from First Lien Bank Lenders by impermissibly extending to January 26, 2015 what was initially a pre-petition consent solicitation ending on January 14, 2015 (the "Improper Post-Petition Solicitation").  Although the Intralinks posting purported to be made upon request of the Debtor, the posting instructed First Lien Bank Lenders to direct business related questions to CEC's financial advisor, The Blackstone Group, and legal questions to CEC's counsel, Paul, Weiss, Rifkind, Wharton & Garrison LLP, thereby demonstrating the lengths at which CEC is attempting to control every aspect of the Debtor and this case.

The Improper Post-Petition Solicitation provides that in exchange for (a) the payment of a $150 million "consent fee", (b) the opportunity to purchase a *pro rata* share of $150 million of convertible notes to be issued by CEC and (c) receiving a portion of a cash sweep from the Debtor (collectively, the "Consent Payments"), consenting First Lien Bank Lenders must send their signature page to CEC and become party to a restructuring support agreement with the Defendants (the "RSA"), which, in turn, obligates such lender to (x) vote in favor of a yet-to-be-filed plan of reorganization implementing the Debtor's previously-announced REIT restructuring, (y) vote to amend and strip the current CEC guaranty of the First Lien Loans and (z) provide the Defendants and their respective directors and officers, as well as the sponsors, broad releases from any and all claims and causes of action, including with respect to the

_____

that the bankruptcy cases should instead proceed in the Illinois Bankruptcy Court, the Plaintiff respectfully requests that this Brief and the accompanying Motion be transferred.

fraudulent transfers and breaches of fiduciary duty that occurred during the past 15 months.

By issuing the Improper Post-Petition Solicitation and extending the Initial Consent Date (defined below), the Defendants are attempting to subvert the plan and disclosure statement process in violation of section 1125(b) of the Bankruptcy Code. Indeed, given the heavy media coverage this Involuntary Chapter 11 Case and the Illinois Proceedings receive, the Defendants knew or should have known that word of the solicitation extension would immediately be picked up by the press and widely disseminated. The Defendants, each represented by sophisticated counsel, no doubt understand that soliciting plan votes absent a Court-approved disclosure statement is impermissible.

The Defendants want this Involuntary Chapter 11 Case and the Illinois Proceedings to be fast-tracked in order to ram through the RSA "deal" supported by only one creditor constituency (holding less than a third of the Debtor's overall debt), while cramming down all other creditors and releasing third party non-Debtors from billions of dollars' in potential liability. The Defendants' attempts to impermissibly influence the plan process on the very morning the Illinois Proceedings were commenced is just an extension of this strategy.

The Defendants' actions should be immediately enjoined and sanctioned, especially given the high likelihood that the Defendants will continue to extend the impermissible post-petition consent solicitation period beyond January 26, 2015. Importantly, any votes cast by creditors improperly solicited through the Improper Post-

Petition Solicitation may ultimately be subject to designation under section 1126(e) of the Bankruptcy Code.

The first priority for the Debtor pre-petition, and now post-petition, is apparently protecting CEC.  Now, however, under this Court's supervision and authority, that priority must instead be protecting its estate and acting as a responsible fiduciary for the benefit of its creditor constituencies.  Enjoining the behavior of the Defendants is an essential step to ensure that the Defendants will act in the fashion required by the bankruptcy laws and rules.

## IV.    FACTS[2]

In 2008, CEC (then operating as Harrah's Entertainment Inc.) was taken private in a $27 billion leveraged buyout—one of the largest LBOs in United States history.  The deal was financed, in part, through the Credit Agreement that made the Debtor (then operating as Harrah's Operating Company, Inc.) the primary obligor on most of the debt used to fund the buyout.  Almost immediately, the financial crisis had a severe adverse impact on the Debtor's and the Subsidiary Debtors' (defined below) businesses.

As alleged in certain of the lawsuits described in the paragraph below, beginning in 2008, and burdened with nearly $20 billion of the debt incurred in the LBO and subsequent transactions and generating substantial operating losses, the Debtor began transferring away billions of dollars' worth of its most valuable assets for little or no consideration, including (a) eight casinos, hotel and entertainment properties on the Las Vegas Strip and elsewhere, as well as 50% of the management fees with respect to certain of these properties, (b) the Debtor's online gaming business and (c) valuable intellectual

---

[2]    The facts set forth herein are alleged in the Complaint and supported by the documents annexed to the Pasquale Declaration.

property rights, including the Debtor's Total Rewards® customer loyalty program. These transfers were not made to third-parties, but rather CEC-affiliated non-Debtor entities that sit outside the Debtor's current capital structure.

In August, September and November of 2014, the Defendants and certain of their directors and officers were sued for alleged fraudulent transfers, waste, mismanagement, breaches of fiduciary duties and a host of other claims based upon the transactions described above.  These pending lawsuits, now stayed against the Debtor, include: (i) *UMB Bank v. Caesars Entertainment Corp. et al.*, Case No. 10393 (Court of Chancery for the State of Delaware); (ii) *MeehanCombs Global Credit Opportunities Master Fund LP et al. v. Caesars Entertainment Corp. et al.*, Case No. 1:14-cv-07091  (S.D.N.Y.) and (iii) *Wilmington Savings Fund Society, FSB v. Caesars Entertainment Corp. et al.*,  Case No. 10004-VCG (Court of Chancery for the State of Delaware).

On October 16, 2014, certain members of the Ad Hoc Committee executed non-disclosure agreements ("NDAs") with the Debtor and commenced good faith negotiations regarding a comprehensive restructuring of its indebtedness.

Negotiation among the parties eventually broke down, and on December 10, 2014, each of the NDAs expired pursuant to its terms.  On December 11, 2014, the members of the Ad Hoc Committee who had previously been party to the NDAs disclosed all material nonpublic information regarding the Debtor in a press release (*available at*: http://www.prnewswire.com/news-releases/informal-committee-of-certain-first-lien-bank-lenders-of-caesars-entertainment-releases-information-about-restructuring-discussions-300008934.html).

On January 12, 2015, the Involuntary Chapter 11 Case was commenced.  The petitioners also filed the Examiner Motion.

Also on January 12, 2015, the Defendants each announced in a press release and on Form 8-K filings[3] with the SEC that they were seeking consents (the "Initial Consent Solicitation") from First Lien Bank Lenders to sign the RSA that required them to cast votes as creditors of the Debtor in favor of a restructuring plan for the Debtor's outstanding obligations and liabilities,[4] to be entered into among the Defendants and any consenting First Lien Bank Lenders (each, a "Consenting Lender").  As further described in the 8-K filings, Consenting Lenders would receive (i)  their *pro rata* share of a $150 million consent fee from CEC, one-half of which would be paid within 3 business days after the 50% minimum consent threshold is met, and the remaining one-half would be paid on the effective date of a plan of reorganization, (ii) the opportunity to purchase their *pro rata* share of $150 million of certain convertible notes to be issued by CEC and (iii)  a portion of the cash sweep to be shared with holders of the Debtor's first lien notes.

Also on January 12, 2015, the administrative agent under the Credit Agreement, at the request of the Debtor, posted to the Intralinks website ("Intralinks") a memorandum prepared by the Debtor (the "Initial Intralinks Posting") requesting consents to the RSA and attaching for First Lien Bank Lenders to review, (i) a Restructuring Consent Term Sheet, (ii) a Restructuring Support and Forbearance Agreement, (iii) a Summary Term Sheet for Proposed Restructuring, (iv) a signature page

---

[3]     Copies of the Form 8-K filing made by the Defendants, as well as the related press releases, are attached to the Pasquale Declaration as Exhibit A.

[4]     The RSA was filed with the SEC as an attachment to the Form 8-K filings, and can be found in Exhibit A attached to the Pasquale Declaration.  Additionally, the RSA has the restructuring term sheet annexed to it, which is expressly made part of the RSA.

to the Restructuring Agreement and (v) a $150 million Convertible Senior Notes—Summary of Principal Terms, including an election form for Consenting Lenders (collectively, the "Intralinks Documents").  First Lien Bank Lenders who wanted to consent to the RSA and receive the Consent Payment were asked to execute a signature page and return it to CEC's counsel (not the Debtor's counsel) per the instructions contained in the Initial Intralinks Posting.  Likewise, any questions regarding the posting memorandum or the terms of the RSA were not to be directed to the advisors to the Debtor to whom Consenting Lenders would have bound themselves to vote in favor of the plan described in the RSA, but rather to the financial advisor and counsel to CEC. Copies of the Initial Intralinks Posting and the Intralinks Documents are attached to the Pasquale Declaration as Exhibit B.

In exchange for the Consent Payment, Consenting Lenders would be required to vote all of their First Lien Loans in favor of the Debtor's future plan of reorganization (implementing the terms of the restructuring set forth in the RSA and on a restructuring term sheet annexed to the RSA), and the Debtor, its estate and all of the Debtor's creditors "shall be deemed to have released CEC . . . and [its] respective direct and indirect sponsors, shareholders, affiliates, officers, directors, employees, managers, attorneys, professionals, advisors and representatives . . . from any and all claims, obligations, suits, judgments, damages, rights, causes of action and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, at law, in equity or otherwise, relating to or based upon any act or omission relating to the [Debtor] which occurred prior to the effectiveness of the [restructuring transaction]." The consent period under the Initial Consent Solicitation and the Initial Intralinks Posting

was scheduled to end at 9:00 p.m., New York City time, on January 14, 2015 (the "Initial Consent Date").

Upon the Initial Consent Solicitation and Initial Intralinks Posting on January 12, 2015, and in order to try and combat CEC's ability to immediately strip the guaranty and the Defendants' efforts to obtain releases for their pre-petition activities, the Plaintiffs and certain other First Lien Bank Lenders (holding in excess of 50% of the aggregate principal amount of First Lien Loans) entered into a binding agreement (the "Lender Agreement") pursuant to which each agreed, with respect to the First Lien Loans that it owned or controlled, to not support the restructuring transaction contemplated by the RSA and restructuring term sheet unless the transaction was approved by the requisite supermajority threshold of First Lien Bank Lenders that were party to the agreement. The Lender Agreement was subsequently amended on January 16, 2015, and now contains signatures from First Lien Bank Lenders holding approximately 56% of all First Lien Loans.

On January 14, 2015, the Debtor filed the *Objection of Caesars Entertainment Operating Company, Inc. to (1) Motion of Petitioning Creditors for an Order Staying Any Parallel Proceedings and (2) Emergency Motion to Shorten Notice and Scheduling an Expedited Hearing on Motion to Stay any Parallel Proceedings* [Docket No. 29] in the Involuntary Chapter 11 Case.  In the Objection, the Debtor stated that it was 24 hours away from commencing the Illinois Proceedings, a move evidently engineered because of the Defendants' perceived notion that the Seventh Circuit is more liberal than this Court in granting non-consensual third party releases to non-Debtors as part of a plan process.

At 1:37 a.m. ET on January 15, 2015 (the "Illinois Petition Date"), the Debtor, together with 172 of its subsidiaries (the "Subsidiary Debtors"), voluntarily commenced the Illinois Proceedings in the Illinois Bankruptcy Court (Case No. 15-01145 (ABG)) starting with the filing of the petition for relief with respect to Southern Illinois Riverboat Casino Cruises Inc. (Case No. 15-01143).

Also on the Illinois Petition Date and hours after the commencement of the Illinois Proceedings, the Defendants announced that the Debtor was extending the Initial Consent Date beyond the Petition Date.  The announcement of the Improper Post-Petition Solicitation was made through the filing of Form 8-Ks with the SEC (copies of which are attached to the Pasquale Declaration Exhibit C), as well as through a subsequent memorandum prepared by the Debtor and posted to Intralinks (the "Post-Petition Intralinks Solicitation", a copy of which is attached to the Pasquale Declaration as Exhibit D).  The Post-Petition Intralinks Solicitation referred First Lien Bank Lenders to the Initial Intralinks Posting and the Intralinks Documents, and notified them that the Debtor was extending the period during which it was seeking First Lien Bank Lender consents to the RSA "from 9:00 p.m. (New York City time) on January 14, 2015, to **5:00 p.m. (New York City time)** on **Monday, January 26, 2015 [].**" (emphasis in original). Once again, First Lien Bank Lender questions were directed to the advisors of CEC (and not to the Debtor's advisors), and those who wished to "hit the bid" were to return signature pages to CEC's counsel.  News of the Improper Post-Petition Solicitation was soon picked up by various media outlets, including Yahoo! Finance (*available at*: http://biz.yahoo.com/e/150115/czr8-k.html).

On January 23, 2015, the Plaintiff filed the Complaint and Pasquale Declaration.

## V.    ARGUMENT

The Plaintiff respectfully requests that the Court immediately issue a TRO and preliminary injunction staying and enjoining the Defendants from continuing the Improper Post-Petition Solicitation and all further attempts to extend the solicitation period prior to a Court-approved disclosure statement for the Debtor.

The Defendants, by issuing the Improper Post-Petition Solicitation and utilizing CEC's financial advisor to attempt to sign First Lien Bank Lenders to the RSA, are soliciting the support and votes of First Lien Bank Lenders in violation of the provisions of the Bankruptcy Code.  Section 1125(b), which bars just this type of improper solicitation, is abundantly clear; the Defendants may not solicit votes "*after the commencement of the case . . . unless, at the time of or before such solicitation . . .*" a court-approved disclosure statement that contains adequate information is provided to the First Lien Bank Lenders.[5]  11 U.S.C. § 1125(b) (emphasis added).

The term "solicit" as used in section 1125(b) of the Bankruptcy Code is narrowly defined to "include only the 'specific request for an official vote,'" (*Century Glove, Inc. v. First Am. Bank of New York*, 860 F.2d 94, 97 (3d Cir. 1988) (*quoting In re Snyder*, 51 B.R. 432, 437 (Bankr. D. Utah 1985)), and the Improper Post-Petition Solicitation falls squarely within section 1125(b) of the Bankruptcy Code.  As described above, in order to receive the Consent Payment, First Lien Bank Lenders must become Consenting Lenders by returning their signature page to CEC's counsel and signing up to the RSA, which, in turn, obligates each Consenting Lender to (i) vote in favor of the Debtor's plan, which is required to be filed within 45 days after the petition date and which must include all of

---

[5]    CEC's violations are especially egregious since CEC is a non-Debtor and has solicited votes during the Debtor's exclusivity period in violation of section 1121 of the Bankruptcy Code.

the specific terms contained in the RSA and its exhibits, (ii) agree to amend and strip the CEC guaranty and (iii) give the Defendants (including their officers and directors), as well as the sponsors of the Defendants, broad third-party releases from any and all causes of action.

It is inconceivable that the Defendants could deem the Improper Post-Petition Solicitation to embody a "negotiation" and therefore be outside of the purview of section 1125(b) of the Bankruptcy Code. As the Defendants are acutely aware, their negotiations with the Plaintiff broke down in December 2014 without reaching a consensual resolution. Moreover, as the Lender Agreement aptly demonstrates, the RSA does *not* embody the culmination of any restructuring negotiations or represent an agreed-upon resolution of various disagreements between the Plaintiff, on one hand, and either of the Defendants, on the other hand. Instead, Plaintiff's members, who constitute a majority of all First Lien Bank Lenders, do not support the RSA or the Debtor's announced restructuring plans.

Likewise, given that the outstanding principal balance of the First Lien Loans exceeds $5.3 billion, many of the improperly solicited parties may not be highly sophisticated financial institutions represented by capable legal and/or financial advisors who are well informed about the Debtor's (or the Subsidiary Debtors') businesses or the Involuntary Chapter 11 Case and Illinois Proceedings, such that dissemination of a Court-approved disclosure statement might otherwise be unnecessary. *See, e.g.*, *In re Gilbert*, 104 B.R. 206, 215 (Bankr. W.D. Mo. 1989).

Rather, the broader First Lien Bank Lender group is likely comprised of numerous investors who own small amounts of the First Lien Loans and are "too ill-

informed" regarding the chapter 11 process to act capably in their own interest. *See In re Heritage Org.*, 376 B.R. 783, 794 (Bankr. N.D. Tex. 2007). These First Lien Bank Lenders, which are the target of the Defendants, as well as CEC's financial advisor, are not the typical institutions who invest in the distressed space or regularly find themselves in restructuring situations, and they may be unaware of the rights they are giving up in connection with the RSA. Accordingly, they must be provided with adequate information through a disclosure statement in order to make an informed voting decision. For this reason, courts have concluded that the dissemination of materials without court approval that are intended to solicit votes on a plan violates section 1125(b) of the Bankruptcy Code. *See, e.g.*, *In re California Fid., Inc*., 198 B.R. 567 (B.A.P. 9th Cir. 1996); *In re Nautilus of New Mexico, Inc.*, 83 B.R. 784 (Bankr. D.N.M. 1988); *In re Temple Ret. Cmty., Inc.*, 80 B.R. 367 (Bankr. W.D. Tex. 1987). All First Lien Bank Lenders should be afforded the opportunity to receive full disclosure rather than having their votes undermined.

The Improper Post-Petition Solicitation should be enjoined to prevent further harm to the Plaintiff and the bankruptcy estate. A party seeking a temporary restraining order or preliminary injunction pursuant to Bankruptcy Rule 7065 "must demonstrate: (i) a reasonable likelihood of success on the merits; (ii) a likelihood that it will suffer irreparable harm if relief is denied; (iii) that the nonmoving party will not suffer even greater harm if the injunction is granted; and (iv) that the public interest favors such relief." *In re Broadstripe, LLC*, 402 B.R. 646, 655 (Bankr. D. Del. 2009), as amended (Mar. 10, 2009) (*citing Kos Pharm., Inc. v. Andrx Corp*., 369 F.3d 700, 708 (3d Cir.

2004); *Video Pipeline, Inc. v. Buena Vista Home Entm't, Inc.*, 342 F.3d 191, 196 (3d Cir. 2003)).

Moreover, grant of an injunction pursuant to section 105(a) of the Bankruptcy Code requires that the Court consider the following substantially similar factors: (i) the danger of imminent, irreparable harm if the preliminary injunction is not issued; (ii) a reasonable likelihood the movant will be successful on the merits of the case; (iii) the balance of the relative harm as between the moving parties and the other parties who would be restrained; and (iv) a balancing of the public interest in successful bankruptcy reorganizations with other competing societal interests. *See, e.g.*, *In re Am. Tissue, Inc.*, No. 01-10370 KG, 2006 WL 3498065, at *3 (Bankr. D. Del. Dec. 4, 2006); *In re CareMatrix Corp.*, 306 B.R. 478, 485 (Bankr. D. Del. 2004); *see also In re Lancelot Investors Fund, L.P.*, No. 08-28225, 2011 WL 1465579, at *2 (Bankr. N.D. Ill. Apr. 15, 2011).

As set forth above, there is little question that the Plaintiff will succeed on the merits.  The Defendants' actions since the Petition Date are a solicitation in violation of section 1125(b) of the Bankruptcy Code.  Lobbying First Lien Bank Lenders to sign up to a deal and binding them to vote for a plan of reorganization the myriad terms of which are dictated by the RSA, while not providing the required disclosure, is exactly what section 1125(b) of the Bankruptcy Code is meant to prevent.

Here, there is also imminent danger that the Defendants' impermissible attempts to buy plan votes will cause irreparable harm to the Plaintiff and this Involuntary Chapter 11 Case. If the Improper Post-Petition Solicitation continues, the First Lien Lenders, including the Plaintiff, will continue to be solicited by Defendants to vote on a plan of

reorganization without adequate information and, indeed, without a plan of reorganization having even been filed.  The Plaintiff and other non-consenting First Lien Lenders will be harmed absent issuance of an injunction because the Defendants, if successful in buying votes without the proper disclosure required by section 1125(b), could (i) be able to strip the CEC guaranty that currently exists as security for the First Lien Loans and (ii) obtain releases for themselves and their directors and officers (and the sponsors) of valuable pre-petition claims for, *inter alia*, fraudulent transfers and breaches of fiduciary duty on the back of improperly solicited votes for the Debtor's plan.

Moreover, although the Plaintiffs and certain other First Lien Bank Lenders were able to coalesce sufficient First Lien Loans through the Lender Agreement to temporarily counter the devastating damage that stripping of the CEC guaranty and release of claims would have on the trading price of the First Lien Loans, doing so has come at a price. The Lender Agreement greatly impacts the transferability and liquidity of the First Lien Loans that are subject to the agreement.  Moreover, the Lender Agreement, by its terms, does not exist in perpetuity.  Both of these points further highlight the irreparable harm the Plaintiff and other First Lien Bank Lenders will be subjected to absent injunctive relief.

The balance of relative harm as between the Defendants and the other creditors (including the Plaintiff) in the case also weighs well is favor of the creditors—First Lien Bank Lenders should be afforded the opportunity to receive full disclosure, instead of having their votes co-opted by the Defendants.  Without appropriate disclosure provided for in section 1125(b) of the Bankruptcy Code, First Lien Bank Lenders are likely to be deceived by the Defendants to prematurely sign away their rights. To that end, the

Improper Post-Petition Solicitation also subjects all improperly solicited creditors to vote designation, and is counter-productive to the Involuntary Chapter 11 Case in general.

Finally, the public interest clearly favors issuing the TRO and preliminary injunction in order to prevent the Defendants from engaging in further improper activity. An injunction will serve the public interest inherent in carrying out the policies underlying the Bankruptcy Code. *See In re Integrated Health Servs., Inc.*, 281 B.R. 231, 239 (Bankr. D. Del. 2002) ("In the context of a bankruptcy case, promoting a successful reorganization is one of the most important public interests.") (citing *American Film Tech., Inc. v. Taritero (In re American Film Tech., Inc.)*, 175 B.R. 847, 849 (Bankr. D. Del.1994); *Gathering Rest., Inc. v. First Nat'l Bank of Valparaiso (In re Gathering Rest., Inc.)*, 79 B.R. 992, 999 (Bankr. N.D. Ind. 1986)). Permitting the Defendants to solicit votes on a future, undrafted plan on the very first day of this Involuntary Chapter 11 Case would render the protections of section 1125(b) of the Bankruptcy Code meaningless. Also, if section 1125(b) of the Bankruptcy Code was only meant to apply to a debtor, the purpose of the protections afforded by it would be obviated. Any non-debtor party (CEC here) such as an affiliate, shareholders, equity sponsors or creditors could buy plan votes without recourse or remedy. Section 1125(b) is intended to prevent that result.

*[Remainder of Page Intentionally Left Blank]*

## VI.    CONCLUSION

For the reasons set forth above, the Plaintiff respectfully requests that the Court (a) immediately issue a TRO and preliminary injunction staying and enjoining the Defendants from continuing the Improper Post-Petition Solicitation and all further attempts to extend the solicitation period absent a Court-approved disclosure statement in violation of section 1125(b) of the Bankruptcy Code and (b) grant such other relief as this Court may deem just and proper.


Dated:    January 23, 2015
        Wilmington, Delaware              BAYARD, P.A.

                                        */s/ Justin R. Alberto*
                                        Neil B. Glassman (No. 2087)
                                        Justin R. Alberto (No. 5126)
                                        222 Delaware Avenue, Suite 900
                                        Wilmington, Delaware 19801
                                        Telephone: (302) 655-5000
                                        Facsimile: (302) 658-6395
                                        Email: nglassman@bayardlaw.com
                                                jalberto@bayardlaw.com

                                            -and-

                                        STROOCK & STROOCK & LAVAN LLP
                                        Kristopher M. Hansen
                                        Frank A. Merola
                                        Kenneth Pasquale
                                        Jonathan D. Canfield
                                        180 Maiden Lane
                                        New York, New York  10038
                                        Telephone: (212) 806-5400

                                        *Counsel to the Ad Hoc Committee of First Lien Bank Lenders*