**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| CAESARS ENTERTAINMENT OPERATING COMPANY, INC., | ) Case No. 15-10047 (KG) |
| Alleged Debtor. | ) |
| | ) |
| | ) |
| THE AD HOC COMMITTEE OF FIRST LIEN BANK LENDERS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Adv. Proc. No. 15-50090 (KG) |
| | ) |
| CAESARS ENTERTAINMENT OPERATING COMPANY, INC. and CAESARS ENTERTAINMENT CORPORATION, | ) |
| | ) |
| Defendants. | ) |
| | ) **Re: Docket No. 2** |

**RESPONSE OF CAESARS ENTERTAINMENT CORPORATION TO MOTION OF THE AD HOC COMMITTEE OF FIRST LIEN BANK FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

Defendant Caesars Entertainment Corporation ("CEC") submits this response (the "Response") in opposition to the Motion of the Ad Hoc Committee of First Lien Bank Lenders (the "Ad Hoc Committee") for a Temporary Restraining Order and Preliminary Injunction [Docket No. 2] (the "Motion"). In support of this Preliminary Response, CEC respectfully states as follows.

**Preliminary Statement**

This Motion follows months of good-faith effort by the Alleged Debtor Caesars Entertainment Operating Company ("CEOC") and CEC to negotiate a consensual restructuring with certain holders of first lien CEOC debt (the "First Lien Bank Lenders"). Although a

Restructuring Support Agreement (the "Bond RSA") has been reached with holders of more than 80 percent of CEOC's first lien bonds and approximately 18 percent of CEOC's first lien bank debt, negotiations with the remaining First Lien Bank Lenders have thus far been unsuccessful.

The Ad Hoc Committee now seeks to squeeze additional concessions from CEC. They have done so, *first*, by entering into an agreement among themselves to prevent members of their group from accepting proposals proffered in good faith, reflecting their apparent concern that some members of their group—who are among the most sophisticated investors in the market—might find those proposals attractive. *Second*, they now seek through this Motion—filed more than ten days after the proposals they challenge were proffered, and just one business day before those proposals expire by their terms—to preclude presentation of any restructuring proposal to First Lien Bank Lenders. Moreover, by filing their Motion late on the Friday evening before the Monday hearing at which the Court is scheduled to consider a wholly unrelated motion relating to the venue of these cases, and by littering their motion papers with misleading and demonstrably false assertions about events in the months leading to CEOC's chapter 11 case, Plaintiff seeks improperly to influence the Court's consideration of the venue motion while limiting the opportunity to reply.

Plaintiff's Motion is devoid of merit and should be denied. Under well-established precedent, the continuing efforts to obtain agreement to a restructuring support agreement are not a solicitation of acceptance or rejection of a chapter 11 plan prohibited by section 1125(b) of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code"). There is no chapter 11 plan for CEOC, and the proposed agreement expressly contemplates that any plan is subject to further negotiation and to Court approval of a plan and disclosure statement. Significantly, Plaintiff cites to *no* case or any other authority—none—in support of its assertion

that the routine practice of seeking consents post-petition to a restructuring support agreement is prohibited by the Bankruptcy Code. On the contrary, courts have recognized that such agreements are common and invaluable tools for efficient, consensual chapter 11 cases, and courts routinely approve of their use. Plaintiff cannot succeed on the merits of its claim, and thus is not entitled to any injunctive relief. In any event, because the period for consent will close at 5 p.m. on Monday—and, as CEOC has announced, will not be extended—Plaintiff will suffer no harm, irreparable or otherwise.

**Factual Background**

The 2008 recession had a severe impact on the gaming industry and, along with increased competition and market saturation, led to years of declining revenues. Faced with mounting debts and dwindling cash, in 2013 and 2014 CEOC engaged in a series of asset sales and capital market transactions designed to extend its debt maturities and deleverage its balance sheet.

Plaintiff dismisses these transactions as "transfers" made "for little or no consideration." (Pl. Mem. at 5.) That is demonstrably not so. Combined, these deals netted nearly $2.8 billion in cash and assumed debt, and substantial other considerations. (Declaration of Jeffrey D. Saferstein Exs. B, C, D, E ("Saferstein Decl.").) In turn, these transactions enabled the continued repayment of interest and principal on outstanding debt, including debt owed to the First Lien Bank Lenders. And each of these transactions was reviewed by independent advisors who opined that the consideration received was fair and reasonable. (*Id*.) These transactions provided the cash needed to continue making principal and interest payments due to creditors, including the members of Plaintiff's group.

Beginning in mid-2014, restructuring negotiations were begun with several principal creditor groups, including certain First Lien Bank Lenders. (*Id*. Ex. F.) The First Lien Bank Lenders, including members of Plaintiff, are sophisticated financial institutions that were

represented throughout the parties' discussions by experienced counsel and financial advisors. Beginning in mid-2014, the parties engaged in months of strenuous, arm's length negotiations in an effort to reach an agreement. (*See id*. Ex. A.)

To date, no agreement has been reached with the First Lien Bank Lenders. On December 11, 2014 the First Lien Bank Lenders—unilaterally and without prior notice—publicly released a summary of the material terms of the then most recent proposal, along with 75 pages of material the parties had exchanged. (*Id*. Ex. I.) In the press release that announced this release, the First Lien Bank Lenders announced that "they reached an oral agreement in principle with the Company on certain material economic terms," but that agreement was "contingent" upon a similar agreement being reached with certain beneficial holders of CEOC's first lien notes (the "First Lien Noteholders"). (*See* Press Release, *available at* http://www.prnewswire.com/news-releases/informal-committee-of-certain-first-lien-bank-lenders-of-caesars-entertainment-releases-information-about-restructuring-discussions-300008934.html.) Following that disclosure, the parties continued informal negotiations throughout December and January.

In contrast to the unsuccessful negotiations with the First Lien Bank Lenders, negotiations during the same period with certain beneficial holders of CEOC's first lien notes (the "First Lien Noteholders"), (*id*. Ex. G), led to an agreement on the Bond RSA dated December 19, 2014, which was later amended and restated. (*Id*. Ex. H.) That agreement was publicly disclosed on December 22nd. (*See id*.)

On January 12, 2015, CEOC provided a proposed Bank RSA to the First Lien Bank Lenders and publicly announced the offer in an 8-K. Like the Bond RSA, the Bank RSA is not a chapter 11 plan, but an agreement on basic economic terms. It requires the parties to the Bank RSA to continue negotiations in good faith to develop the plan and related disclosure statement,

(*id*. Ex. J at § 2(a)(i)), and provides consenting creditors with a right of termination and withdrawal of support if the parties are unable to develop a plan that is "materially consistent" with the Bank RSA and "reasonably acceptable" to the consenting creditors.  (*Id.* § 8(e).) Solicitation for plan approval occurs only after a disclosure statement has been approved by the Court.  (*Id.* § 2(a)(iii).)  The Bank RSA includes additional consideration from CEC, a non-debtor, to First Lien Bank Lenders who agreed to sign it, including: (a) a $150 million amendment fee; (b) the right to purchase a pro rata portion of $150 million in CEC convertible notes; and (c) receipt of a portion of a cash sweep upon CEOC's exit from chapter 11.  (*Id.*) Consent to the Bank RSA was initially sought through January 14, 2015 at 9 p.m.  (*Id.*)  On January 15, 2015, it was announced that the deadline would be extended to 5 p.m. on January 26, 2015.  (*Id.* Ex. K.)

As stated in the *Preliminary Response of Caesars Entertainment Operating Company, Inc., to Motion of the Ad Hoc Committee of First Lien Bank Lenders for a Temporary Restraining Order and Preliminary Injunction*, filed January 24, 2015 [Docket No. 5], the consent deadline will not be extended past January 26, 2015, and the Bank RSA, per its terms, will not go effective.

**Argument**

Preliminary injunctive relief is appropriate only when, *inter alia*, a party is likely to succeed on the merits and will suffer irreparable harm absent the requested relief.  *In re Broadstripe*, 402 B.R. 646, 655 (Bankr. D. Del. 2009).  Plaintiff satisfies neither requirement. *First*, the Bank RSA, by its very terms, is not a solicitation under Bankruptcy Rule 1125(b). *Second*, there is no irreparable harm; the proposal will expire by its terms tomorrow, January 26, 2015 and will not be extended.

I.    **PLAINTIFF CANNOT SUCCEED ON THE MERITS**

Plaintiff's contention that the efforts to reach agreement on the Bank RSA, following months of negotiation, constitute an improper post-petition solicitation is inconsistent with the relevant provision of the Bankruptcy Code, its purpose, and established precedent.

Section 1125(b) provides that "[a]n acceptance or rejection of a plan may not be solicited after the commencement of the case under this title . . .  unless, at the time of or before such solicitation, there is transmitted . . . a written disclosure statement approved, after notice and a hearing, by the court as containing adequate information."  11 U.S.C. § 1125(b) (emphasis added).  As commentators have observed, this provisions applies only to "the formal polling process in which the ballot and disclosure statement are actually presented to creditors with respect to a specific plan."  Collier on Bankruptcy ¶ 1125.05 (Alan N. Resnick & Henry J. Sommer eds., 16th ed.) (citing *In re Dow Corning Corp.*, 227 B.R. 111, 118 (Bankr. E.D. Mich. 1998); *In re Kellogg Square P'ship*, 160 B.R. 336. 340 (Bankr. D. Minn. 1993)).

Consistent with the statutory language and the overarching goal of the Bankruptcy Code to encourage compromise, the Third Circuit has emphasized that the term "solicitation" in section 1125(b) "must be read narrowly" because a "broad reading of § 1125 can seriously inhibit free creditor negotiations."  *Century Glove, Inc.* v. *First Am. Bank of New York*, 860 F.2d 94, 101 (3d Cir. 1988).  As the court reasoned in *Century Glove*, "[t]he purpose of negotiations between creditors is to reach a compromise over the terms of a tentative plan" and "[t]he purpose of compromise is to win acceptance for the plan."   *Id*.  As a matter of law, there is "no principled predictable difference between negotiation and solicitation of future acceptances." *Id*.

Thus, courts have held that efforts to obtain consent to restructuring support agreements such as the proposed Bank RSA do not constitute "solicitation" prohibited by section 1125(b).  *See, e.g.*, *Indianapolis Downs, LLC*, 486 B.R. 286, 293–97 (Bankr. D. Del. 2013) (declining to

designate votes made pursuant to post-petition plan support agreement where agreement did not require parties to vote for a plan that differed materially from the one contemplated by the support agreement); *In re Residential Cap. LLC*, No. 12-12020, 2013 WL 3286198, at *20 (Bankr. S.D.N.Y. Jun. 27, 2013) (approving post-petition plan support agreement where "there are numerous termination events that allow a party to withdraw" and "none of the parties have agreed to vote in favor of the Plan unless and until the Court approves the disclosure statement"). Likewise, courts have routinely approved post-petition plan support agreements, with no suggestion that they are somehow improper. *See Residential Cap.*, 2013 WL 3286198, at *20 (citing cases). Plaintiff's brief cites no case to the contrary, from this or any other court.

The effort to obtain consent to the Bank RSA is entirely appropriate under these authorities. The Bank RSA does not seek approval of a reorganization plan; there is no such plan. It codifies a proposed agreement on economic terms, and sets forth a defined process by which the parties will continue to negotiate to develop definitive documents that are consistent with those terms. Should the parties be unable to reach such an agreement on a disclosure statement and plan consistent with its terms, the Bank RSA terminates and consenting creditors are released from any requirement or pledge of plan support. The parties are not obligated to vote to approve the plan unless and until they are "properly solicited to do so under the Bankruptcy Code." (Saferstein Decl. Ex. J, § 2(a)(iii).)

Furthermore, the purpose of section 1125(b)—to protect unsophisticated creditors from being locked into support of a plan without adequate information and court-approved disclosure—is not implicated on these facts. Plaintiffs are extraordinarily sophisticated financial actors with substantial experience negotiating with distressed debtors and navigating complex reorganization proceedings, and they are represented by experienced bankruptcy counsel and

financial advisors. *See Indianapolis Downs*, at 295–96 (holding that support agreement posed no material risk where parties were "sophisticated financial players" who were represented by "able and experienced professionals").

For these reasons, CEC's conduct is entirely appropriate.

## II.    PLAINTIFF CANNOT SHOW IRREPARABLE HARM

Plaintiff's request for a TRO and preliminary injunction must also fail because Plaintiff cannot show that, absent its requested relief, the First Lien Bank Lenders will suffer irreparable harm.  The deadline to sign the Bank RSA will lapse on Monday, January 26, 2015, and, as CEOC has stated publicly, will not be extended.  Moreover, the document by its terms does not become effective unless it is approved by at least fifty percent of the First Lien Bank Lenders. The Ad Hoc Committee has stated, however, that holders of over 56% of outstanding claims by First Lien Bank Lenders have entered into a binding agreement not to support the Bank RSA. Thus, the document will not become effective.

### Conclusion

For the foregoing reasons, Plaintiff's Motion for a temporary restraining order and preliminary injunction should be denied.

Dated: January 25, 2015
Wilmington, Delaware

**MORRIS, NICHOLS, ARSHT & TUNNELL LLP**

*/s/ Erin R. Fay*

Robert J. Dehney (No. 3578)
Curtis S. Miller (No. 4583)
Erin R. Fay (No. 5268)
1201 N. Market Street, 16th Floor
P.O. Box 1347
Wilmington, DE 19899
Telephone:  (302) 658-9200
Facsimile:  (302) 658-3989
Email: rdehney@mnat.com
        cmiller@mnat.com
        efay@mnat.com


- and -

Alan W. Kornberg
Lewis R. Clayton
Michael E. Gertzman
Jeffrey D. Saferstein
Jonathan H. Hurwitz
**PAUL, WEISS, RIFKIND,
WHARTON & GARRSION LLP**
1285 Avenue of the Americas
New York, NY 10019
Tel.: 212-373-3000
Fax: 212-757-3990

*Counsel for Caesars Entertainment Corp.*